# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 24, 2008

Charles R. Fulbruge III
Clerk

No. 06-41558

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEAMON RAY CAVITT, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before GARZA and ELROD, Circuit Judges, and HICKS,[*] District Judge.

S. MAURICE HICKS, JR., District Judge:

Leamon Ray Cavitt, Jr. appeals the district court's denial of his Motion to Vacate Conviction, filed pursuant to 28 U.S.C. § 2255. We vacate the judgment of the court below and remand for an evidentiary hearing.

## I. BACKGROUND

On October 28, 2002, Texas State Trooper Nick Granelli ("Granelli" or "the trooper") stopped Leamon Ray Cavitt, Jr.("Cavitt") on U.S. Highway 75 after observing him speeding in a construction zone and failing to signal before changing lanes. A search of the rented Dodge Grand Caravan mini-van driven

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

by Cavitt revealed five kilograms of cocaine.

On November 14, 2002, Cavitt was indicted on one count of possession with intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting under 18 U.S.C. § 2. Represented at his initial appearance on April 30, 2003 by the Federal Public Defender, Cavitt entered an initial plea of not guilty. Subsequently, through retained counsel Barrett Keith Brown ("Brown") and pursuant to a written plea agreement that included a waiver of all rights to appeal, Cavitt changed his plea on the possession charge to guilty.

A video camera mounted inside the patrol car and a microphone attached to Trooper Granelli's clothing recorded the entire encounter between Granelli and Cavitt, as well as Granelli's conversations with "ride-along" off-duty police detective Jon Britton ("Britton"). After entering his guilty plea, Cavitt obtained a copy of the recording.

Upon reviewing the video, Cavitt concluded that the vehicle search was justified neither by reasonable suspicion nor by consent. He decided to release attorney Brown and to retain Michael Heiskell as counsel. With Heiskell's assistance, Cavitt filed a motion to withdraw his guilty plea and a motion to suppress. In his motion to withdraw, Cavitt argued that although the facts of the case justified the filing of a motion to suppress, Brown had refused to file such a motion on the basis that Cavitt consented to the search, which, according to Brown, vitiated any suppression issue. Cavitt's motion to suppress included arguments that the search was unconstitutional under the Fourth Amendment because the detention extended beyond the valid reason for the initial stop, that no reasonable suspicion existed to extend the detention, and that the consent Cavitt gave to search the mini-van was not an act of free will.

The district court denied the motion to withdraw, but never ruled on the suppression motion. Cavitt moved for reconsideration and requested a

hearing on the motion, claiming, among other things, that: (1) Brown had recommended a guilty plea without first viewing a videotape recording of the stop; (2) Brown refused to permit Cavitt to view the videotape until after he entered a guilty plea; and (3) Brown had failed to advise Cavitt that he could enter a conditional plea and/or pursue a motion to suppress without sacrificing a reduction for acceptance of responsibility. Without holding a hearing, the district court denied the motion for reconsideration and sentenced Cavitt to 295 months in prison.

Cavitt did not appeal.[1] Instead, approximately four months after entry of judgment, Cavitt filed a motion pursuant to 28 U.S.C. § 2255, seeking to vacate his conviction and claiming that: (1) the search violated the Fourth Amendment; (2) Brown rendered ineffective assistance of counsel by failing to pursue a motion to suppress; and (3) the plea was not voluntary due to Brown's ineffectiveness, including specifically Brown's failure to advise Cavitt of his right to seek a conditional plea agreement.

Without holding an evidentiary hearing, the magistrate judge assigned to handle the § 2255 motion issued a report and recommendation ("R&R"). The R&R concluded that Brown did not render ineffective assistance of counsel because Cavitt had "not shown that but for Brown's alleged errors he would have rejected the plea agreement and demanded a trial." The magistrate also determined that seeking suppression would have been a "futile effort," as reasonable suspicion justified the search and Cavitt consented to the search. Accordingly, the magistrate judge reasoned, counsel's "belief that the motion would do more harm than good was a reasonable one." The R&R also found that Brown's failure to inform Cavitt of the availability of a conditional plea did not compromise the voluntariness of the plea because before Cavitt entered the

---

[1] As noted above, Cavitt waived his rights to appeal in the written plea agreement.

agreement, Brown informed Cavitt of the maximum possible sentence, and he was sentenced within the statutory sentencing range. The magistrate judge further concluded that Cavitt failed to demonstrate harm because neither the government nor the trial court was bound to accept a conditional plea. Finding Cavitt's objections to the R&R without merit, the district court adopted the R&R and dismissed Cavitt's § 2255 motion. Cavitt filed a timely notice of appeal and sought a Certificate of Appealability ("COA") from the district court, reurging his previous arguments and asserting that the court erred by dismissing his motion without an evidentiary hearing. The district court concluded that any claims regarding the search and seizure should have been raised on direct appeal pursuant to Stone v. Powell, 428 U.S. 465 (1975), and that no evidentiary hearing was required "in light of [Cavitt's] voluntary guilty plea and absence of ineffective counsel in leading to that plea." Accordingly, the court denied the COA.

Cavitt then sought a COA from this court, and we certified the following issues[2] on appeal: (1) whether Brown's failure to file and pursue a motion to suppress constituted ineffective assistance of counsel, (2) whether Brown's failure to advise Cavitt regarding the viability of the Fourth Amendment claim constituted ineffective assistance of counsel with respect to Cavitt's decision to

---

[2] Cavitt also contended in his motion for a COA that Brown misled Cavitt and the court regarding the viability of a suppression motion, again claimed that Brown failed to inform Cavitt that he could plead guilty conditionally without losing acceptance of responsibility points, and argued that the district court erroneously denied the COA.

In the order granting Cavitt's application for a COA, we concluded with respect to the conditional plea issue that "[g]iven the law at the time of the guilty plea, counsel reasonably could have believed that a conditional guilty plea to pursue a Fourth Amendment claim was not a sound option." Order Granting COA, Nov. 5, 2007 (citing *United States v. Maldonado*, 42 F.3d 906, 913 (5th Cir. 1995)). However, more recent case law holds that a district court may not deny a defendant credit for acceptance of responsibility solely because he or she moves for suppression. *See United States v. Washington*, 340 F.3d 222, 230 (5th Cir. 2003) ("In the absence of a conditional plea, the defendant would have to choose between trying to suppress the evidence and receiving credit for acceptance of responsibility. A defendant should not have to make this choice.").

plead guilty, and (3) whether the district court abused its discretion in failing to hold an evidentiary hearing.

## II.  FACTS

As noted above, Cavitt relies on a videotape recording of the vehicle stop and the subsequent search.  The narrative and dialogue that follow are drawn directly from that recording and from uncontested facts reflected in the record.

On the rainy evening of  October 28, 2002, at approximately 7:17 in the evening, Granelli stopped Cavitt after observing him speeding in a construction zone and failing to signal before changing lanes on U.S. Highway 75.   Granelli approached the passenger side of the mini-van rented and driven by Cavitt and leaned into the window.

Granelli asked Cavitt for his driver's license.  Upon viewing the license Cavitt presented, Granelli observed that the photo did not closely resemble Cavitt:  "Boy, you've changed a lot in this picture; lost a bunch of weight?" Granelli proceeded to question Cavitt regarding his itinerary.  Cavitt informed the trooper that he was traveling back to his home in East St. Louis, Illinois after visiting with his daughter in Lancaster, Texas.  Granelli requested rental documents for the mini-van, which Cavitt furnished.

Granelli then requested permission to sit in the mini-van's passenger seat, commenting that he wanted to "get out of the wet weathers [sic]."  Once inside, the  trooper, apparently having noticed some bags inside the vehicle, asked Cavitt if he was moving.  Cavitt explained that he had recently gone shopping. Granelli also inquired about Cavitt's occupation, and Cavitt responded that he was a realtor.  The trooper next informed Cavitt that he would be returning to his patrol car to issue Cavitt a warning.  Granelli indicated that he would return shortly.

As Granelli walked back to his car, the rain intensified.   Inside the patrol

car, Granelli said to ride-along detective Jon Britton, "I sure would love to search this guy." Granelli and Britton discussed Cavitt's itinerary and the fact that he was driving a rental vehicle. Granelli voiced skepticism of Cavitt's claim that he had driven to Texas to visit his daughter and his statement that he had done some shopping. In particular, the time and place the mini-van was rented—October 27, 2002, at 12:21 p.m in East St. Louis, Illinois—and the time it was due back at the facility—October 29, 2002—gave both officers pause. Britton remarked of it, "That's odd, isn't it?" Granelli responded, "Yeah, that's real [sic] odd." The trooper also pointed out to Britton that, "he [Cavitt] don't [sic] look much like that driver's license picture."

Granelli commented that Cavitt "didn't look real [sic] nervous, [though] of course he was sitting down." The trooper then proposed a plan: "I'm going to tell him we're gonna have to get off the road." He radioed Cavitt's driver's license number and tag information to dispatch and mused, "I wonder if there's some place we can get out of the weather." Granelli then remarked again regarding the license photo: "He looks like a black male, but his driver's license . . . ." Britton, apparently still curious about Cavitt's itinerary, asked Granelli to repeat the details of the vehicle rental.

Granelli said again, "I think I'm going to see if he'll follow me up to the Texaco station." The rain intensified, and there follows a period of silence during which the officers apparently waited for the storm to abate. After again noting that Cavitt had not seemed nervous, Granelli resolved: "I'm gonna just go say—see if he'll follow me over there, so I can get my business done without getting everything wet. Think that will alarm him too much if I go do that?"

Once the license check came back negative and the rain died down, Granelli exited the patrol vehicle and again approached the mini-van. He said to Cavitt, "I've got a warning for you to sign but I can't do it in this weather; can you follow me here up the road and we'll get out of the rain real quick?" Cavitt

agreed to follow the officers up to the next exit.  Upon returning to the car, Granelli once again commented that Cavitt seemed relaxed.  Britton asked Granelli if Cavitt was traveling with any luggage, and the trooper responded that he couldn't tell.

The two cars pulled over at a truck stop approximately six minutes later. When Cavitt arrived, the trooper directed him to pull up next to the patrol car, under an overhang.[3]  Both officers approached Cavitt's vehicle.  Instead of immediately asking Cavitt to sign the warning and returning the driver's license, the trooper told Cavitt that he was previously unable to examine the rental papers due to the rain and asked to see them again.  The officers also had Cavitt step outside of the mini-van.

Granelli proceeded to again question Cavitt, this time about his daughter's occupation, his itinerary, and where he had stayed in Lancaster.  In response, Cavitt explained to the officers that his daughter was a child and therefore didn't have a job, and that he had spent the previous night at the home of his daughter's mother.  The trooper next asked Cavitt how long he had lived in East St. Louis and whether drugs were much of a problem there.   Cavitt initially replied, "What?" but, after Granelli repeated the question, Cavitt stated that the drug situation in East St. Louis was "pretty bad."  Granelli questioned Cavitt about whether he had ever used drugs, and  Cavitt admitted to having used marijuana about nine years ago.  The trooper then said to Cavitt, "The reason I'm asking you these questions [is that there] seems to be a pretty big problem with narcotics here on this highway, especially this time of year we see a lot of it."  Granelli asked Cavitt whether anyone had ever asked him to haul drugs.  Cavitt answered "no" and denied that there were any drugs in his van.

Detective Britton spoke up and questioned Cavitt about large trash bags

---

[3] From this point forward, the two officers and Cavitt are outside the visual scope of the dash-mounted camera.  The remainder of the factual narrative is drawn solely from the audio recording.

in the van and his lack of luggage.  Cavitt asked, "Do you want to take a look at them?" and explained that they were full of clothes.  Someone can then be heard removing bags from the van.  At that point, Granelli asked for permission to search Cavitt's mini-van.  Cavitt can faintly be heard responding, "yeah, sure."[4]  A few seconds later, Cavitt attempted to flee, at which point a struggle ensued.

In his brief and at oral argument, Cavitt represented, and the Government did not deny, that the officers did not return the driver's license to Cavitt prior to their search of the mini-van.

## III.  DISCUSSION

In the context of 28 U.S.C. § 2255, this court reviews a district court's factual findings for clear error and its legal conclusions de novo.  See United States v. Edwards, 442 F.3d 258, 264 (5th Cir. 2006).  It reviews a district court's refusal to grant an evidentiary hearing on a § 2255 motion for abuse of discretion.  See id.

As noted above, Cavitt did not directly appeal his conviction.  Nor did he appeal the district court's denial of his motion for reconsideration.  The district court "correctly concluded that Cavitt [could] not raise a Fourth Amendment claim on collateral review."  Order Granting COA, Nov. 5, 2007 (citing United States v. Diaz, 733 F.2d 371, 376 (5th Cir. 1984)).  However, the viability of the Fourth Amendment claim is "inextricably intertwined with Cavitt's claim that his counsel rendered ineffective assistance in respect to failing to pursue a motion to suppress and in failing to advise him properly regarding the viability of such a claim in connection with pleading guilty."  Id.  Accordingly, our inquiry into the errors claimed entails an assessment of Cavitt's putative Fourth Amendment claim. Revisiting Brown's decision not to file a motion to suppress

---

[4]Cavitt argues in his brief that "[n]o response by Cavitt can be readily heard on the audio portion of the videotape."  Although very faint, Cavitt's "yeah, sure" response is audible.

on Cavitt's behalf is critical because "[e]vidence obtained by the government in violation of a defendant's Fourth Amendment rights may not be used to prove the defendant's guilt at trial." United States v. Thomas, 12 F.3d 1350, 1366 (5th Cir. 1994).

## A.  Fourth Amendment Analysis
### 1.  Reasonable Suspicion

Pursuant to the Supreme Court's seminal decision in Terry v. Ohio, 392 U.S. 1 (1968), we have concluded that "[t]he stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  Under Terry, we employ a two-part test to determine the legality of police investigatory stops. We "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id.

Whether an officer's actions are "reasonably related in scope to the circumstances that justified the stop" is a fact-specific question often informed by "timing and sequence." Id. at 510.  Although we have rejected a bright-line approach to reviewing the reasonableness of traffic-related detentions, see id., this court frequently concludes that a search is not reasonably related to the circumstances justifying a traffic violation stop when the search in question occurs after the time required for an officer to issue a citation (or to decide against doing so) and to complete a "computer check" for outstanding warrants and vehicle theft.  In United States v. Santiago, we articulated an oft-cited rule:

> During a traffic stop, an officer can request a driver's license, insurance papers, and vehicle registration; he or she may also run a computer check and issue a citation.  The officer may detain and question the subjects of a traffic stop during the time a computer check is being conducted.  Furthermore, this court usually does not

> scrutinize the particular questions asked during a stop so long as they tend to relate to the purpose of the stop.
>
> ***
>
> However, a Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed.

310 F.3d 336, 341-42 (5th Cir. 2004) (citations omitted); see also United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006) ("Detention . . . may last no longer than required to effect the purpose of the stop. If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." (citations omitted)). Likewise, in United States v. Dortch, 199 F.3d 193, 200 (5th Cir. 1999), a case that predated Santiago, we held that where the evidence plainly reflected that officers completed a computer check before initiating a canine search, it was unreasonable to detain the defendant pending the dog search.

As noted in Santiago, in order to prolong a detention after issuing a citation or determining that no citation should be issued, an officer must have a "reasonable suspicion" that a crime "has been or is being committed." Santiago, 310 F.3d at 342. Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006) ("Under Brigham, the purpose of the initial stop ended at 12:18, when the results of the criminal background check came back negative, unless the officers formed additional reasonable suspicion before that time."). Accordingly, "[o]nce the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been

verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts," id.—suspicion, that is, of criminal activity "additional" to the suspicion that justified the initial stop. Thus, Brown's continuing detention of Cavitt after the negative computer check came was unconstitutionally prolonged unless "additional reasonable suspicion [arose] in the course of the stop and before the initial purpose of the stop ha[d] been fulfilled." United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005).

Reasonable suspicion must be based on more than the officer's sense that a detainee appears to have something to hide. In Santiago this court rejected the government's contention that an officer had reasonable suspicion to continue a detention because the defendant took an unusually long time to pull over, acted nervous, gave seemingly unbelievable answers to various questions, and provided statements regarding the details of his trip that conflicted with the answers provided by the other occupant of the vehicle, who was questioned separately. Santiago, 310 F.3d at 342. We held that "mere 'uneasy feelings' and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking." Estrada, 459 F.3d at 631 (citing Santiago, 310 F.3d at 338-39).

However, reasonable suspicion may arise when the sort of observations and behavior described above are coupled with more concrete evidence that suggests the commission of a specific offense. For example, in Estrada, we concluded that reasonable suspicion was established when an officer noticed "'fresh marks' and 'scratches' around the fuel tank eye piece latches and vehicle frame," which indicated the presence of an "adhesive material" near the gas tank. Id. at 632. In that case, the court made much of the fact that the officer's "extensive classroom training and on-the-job experience, including an occasion at which he found illegal narcotics concealed in a gas tank in a similar fashion," led him to reasonably suspect that "a false compartment or container had been

built into the fuel tank to conceal contraband[—a]dhesive material is typically used to cover newly created compartments to prevent seepage of fuel and contraband." Id. Similarly, in United States v. Sanchez, 507 F.3d 877, 882 (5th Cir. 2007), vacated on other grounds, 128 S. Ct. 2428 (2008), we held that reasonable suspicion arose when an officer noticed prior to a search that the wheel rims on the detainee's truck had been painted. Id. The officer later testified that "he knew that drug traffickers often paint their wheel rims to hide marks stemming from alterations they make to tires and rims to conceal contraband." Id.

Here, Granelli's initial stop was justified on the basis that Cavitt was speeding and failed to signal, a point Cavitt does not dispute. See Lopez-Moreno, 420 F.3d at 430. In addition, during the course of the stop, Trooper Granelli was permitted to examine Cavitt's driver's license and registration and to run a computer check to investigate whether Cavitt had any outstanding warrants and whether the vehicle was stolen. See Brigham, 382 F.3d at 507-08. Once the computer check had been completed and Granelli had prepared the warning, however, the detention could not be prolonged unless additional reasonable suspicion, supported by articulable facts, developed during the stop. See id at 507. Cavitt claims that no additional reasonable suspicion arose and that the officers continued to detain him because they were simply determined to search him, with or without a valid reason, as evidenced by the trooper's statement, "I'd love to search this guy."

The Government argues that a number of circumstances that existed or occurred before the computer check came back negative could have led the officers to suspect that Cavitt might be involved in criminal activity. First, as recorded on the tape, Granelli claimed during the encounter to know that the highway Cavitt was traveling was a known drug route, that drug traffic was particularly heavy during that time of the year, and that Cavitt's home and

destination—East St. Louis, Illinois—was reputed to be a heavy drug trafficking area. Second, as they discussed on tape, the officers found dubious Cavitt's claim that he had rented a mini-van to make a quick trip from Illinois alone and for the purpose of visiting his daughter. Third, the license photograph that Cavitt presented to Trooper Granelli was not a convincing likeness.[5] Finally, the Government claims that the two officers' suspicions were heightened when they noticed a radar detector installed in the rental vehicle and several shopping bags strewn throughout the mini-van.

However, as noted above, reasonable suspicion must be based on more than the officer's hunches and doubts about Cavitt's story. See, e.g., Estrada, 459 F.3d at 631. In order for Cavitt's continued detention to have been justified by reasonable suspicion, the Government must establish some nexus between a specific criminal activity and Cavitt's questionable license and ambitious itinerary. See Jenson, 462 F.3d at 405. In concluding that a search was supported by reasonable suspicion in previous cases, we have relied upon objective evidence of specific criminal activity, interpreted by an officer experienced or educated in detecting that particular sort of activity. See Estrada, 459 F.3d at 632; Sanchez, 507 F.3d at 882.

By way of objective record evidence in this regard, we have only Granelli's statements to Cavitt, made after they had pulled up at the truck stop, indicating that the US Highway 75 is a known drug trafficking route, that drug activity is particularly heavy on Highway 75 during late October, and that East St. Louis is known for its drug activity.[6] However, without any extrinsic evidence or

---

[5]The Illinois driver's license Cavitt presented, which identified him as "Cortez Cavitt," was later determined to be Cavitt's brother's. Although that fact was of course unknown during the stop, it suggests that Granelli's perception that the license photo did not resemble Cavitt may have been well-founded.

[6]The Government states in its brief that Granelli also noticed a radar detector on the mini-van's windshield, along with several shopping and garbage bags strewn throughout the vehicle. However, the record includes no sworn statement from Trooper Granelli confirming these observations and their timing. Nor are

testimony from Granelli as to his experience and education, we are unable to evaluate the validity, basis, or intent behind his statements.

The Government correctly suggests that a comparison of Cavitt's appearance with the license furnished during the stop might have aided the trier of fact in determining whether reasonable suspicion existed. However, the Government's response to Cavitt's § 2255 motion did not include a copy of the license. Neither did it contain a photograph of Cavitt. Considering the record before us, we are unable to determine whether the search of the mini-van was justified by additional reasonable suspicion.

## 2. Consent

Even when reasonable suspicion does not justify a search, however, it does not necessarily follow that a search constitutes a Fourth Amendment violation. Consensual encounters "do not implicate Fourth Amendment concerns," and "a consensual interrogation may follow the end of a valid traffic stop." Brigham, 382 F.3d at 508.

The videotape reflects that Cavitt responded "yeah, sure" when the officers asked if they could search his vehicle. The Government argues, and both Cavitt's previous counsel and district court agreed, that this statement represented valid consent to the search of the mini-van.

We must determine whether Cavitt's "yeah, sure" constitutes validly given consent. In doing so, this court asks (1) whether the consent was voluntary, and (2) whether it was an independent act of free will. See Jenson, 462 F.3d at 406 (internal citations omitted). In evaluating the voluntariness of consent, we look to six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation

---

the radar detector and bags visible on tape.

with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

Id. (citations omitted). To determine whether the consent was an act of free will, we scrutinize the record for any "'break in the causal chain' between the constitutional violation and the consent; that is to say, consent cannot be the product of the illegal detention." Id. at 407 (citation omitted).

On the record before us, it is difficult to construe Cavitt's custodial status as voluntary. Although Cavitt agreed to follow the officers to the truck stop, it appears that the officers failed to issue Cavitt the promised warning and to return the driver's license before the two cars relocated to the truck stop. Consent is valid when offered after a constitutional detainment expires if a reasonable person, at the time the legitimate detainment expired, would have felt free to leave. United States v. Sanchez-Pena, 336 F.3d 431, 442-43 (5th Cir. 2003). A reasonable person in Cavitt's position might not have felt free to leave until he was issued the promised warning and his driver's license had been returned. See United States v. Jordan, 958 F.2d 1085, 1087 (D.C. Cir. 1992) ("[O]nce . . . identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it." (internal citations omitted)). Furthermore, we have previously concluded that an officer's retention of identification documents suggests coercion. See United States v. Chavez-Villareal, 3 F.3d 124, 128 (5th Cir. 1993) (noting that officer's retention of immigrants' alien registration cards when he asked for "permission" to search suggested coercion).

Also of concern is the fact that Cavitt's "yeah, sure" was uttered during a detention precipitated by a possible misrepresentation. "Consent" induced by an

officer's misrepresentation is ineffective.  See United States v. Webster, 750 F.2d 307, 322 (5th Cir. 1984) (holding that a defendant's agreement to ride to the police station for coffee was not informed and could not justify a search that occurred during his subsequent detention).  The Government implies in its brief that Granelli informed Cavitt of the plan to search the vehicle before the trip to the truck stop.  However, the videotape clearly reflects that Granelli asked Cavitt to follow him for the purpose of signing a warning in an area shielded from the elements:  "I've got a warning for you to sign but I can't do it in this weather; can you follow me here up the road and we'll get out of the rain real quick?"

The record contains no information regarding Cavitt's awareness of his right to refuse consent, his education, or his intelligence.  Nonetheless, we are unable to conclude on the basis of the videotape alone whether Cavitt's consent was voluntary and valid.  A reasonable person in Cavitt's shoes might not have felt free to leave before the officers issued him a promised warning and returned his license.  Cavitt's "consent" to decamp to the second location, which preceded Granelli's request to search Cavitt, also may have been compromised by a misrepresentation regarding the purpose of the relocation.

In summary, we are unable to conclude, based on this record, whether the search was justified by either voluntary consent or reasonable suspicion.  Accordingly, we find that Cavitt had an appreciable chance of success on a Fourth Amendment claim, and we now consider whether he received ineffective assistance of counsel in this regard.

### B.  Establishing Ineffective Assistance of Counsel

Under the standard articulated in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), to establish that Brown rendered ineffective counsel, Cavitt must show that: (1) Brown's performance fell below an objective standard of reasonableness; and (2) Cavitt suffered prejudice as a result.  Id.

To demonstrate deficient performance, Cavitt is required to show that in light of all the circumstances as they appeared at the time, "counsel's performance fell below an objective level of reasonableness." Strickland, 466 U.S. at 687-89 ("Judicial scrutiny of counsel's representation must be highly deferential. . . [with] every effort []made to eliminate the distorting effects of hindsight."). Additionally, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (citation and internal quotation marks omitted). If a tactical decision is "conscious and informed . . . [it] cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Crane v. Johnson, 178 F.3d 309, 314 (5th Cir. 1999).

Thus, in assessing Brown's performance with respect to his decision not to file a motion to suppress, we must determine whether the decision was objectively reasonable. In making that determination, we also must consider whether the decision could be construed as "sound trial strategy." If we conclude that the decision was strategic, conscious, and informed, then we should ask whether it rendered the proceedings obviously unfair.

In evaluating Brown's advice regarding Cavitt's guilty plea, our considerations are slightly different. This court has stated that "it is the lawyer's duty to ascertain if the plea is entered voluntarily and knowingly." Herring v. Estelle, 491 F.2d 125, 128 (5th Cir. 1974). The lawyer must

> actually and substantially assist his client in deciding whether to plead guilty. It is his job to provide the accused an understanding of the law in relation to the facts. The advice he gives need not be perfect, but it must be reasonably competent. His advice should permit the accused to make an informed and conscious

> choice. In other words, if the quality of counsel's service falls below a certain minimum level, the client's guilty plea cannot be knowing and voluntary because it will not represent an informed choice. And a lawyer who is not familiar with the facts and law relevant to his client's case cannot meet that required minimal level.

Id. (citations and internal quotation marks omitted). Accordingly, as we determine whether Brown's performance was deficient with respect to the plea advice, we consider whether Brown was "familiar with the [relevant] facts and law" such that the advice he rendered permitted Cavitt to make an informed and conscious choice to plead guilty.

Although the record includes a sworn declaration from Cavitt indicating that his attorney informed him that he could lose acceptance of responsibility points if he filed a motion to suppress, there is no sworn record testimony from counsel explaining the strategy behind his decision. Cavitt also avers that Brown advised him to plead guilty before the defense ever received a copy of the videotape and that, once Brown received a copy of the video, he refused to permit Cavitt to view it before he changed his plea. In light of these uncontradicted claims, and our conclusion that Cavitt's Fourth Amendment claim is not without merit, it is impossible to conclude that Brown's decision not to file a motion to suppress was "strategic, conscious, and informed." See Strickland, 466 U.S. at 689; Crane, 178 F.3d at 314. Nor can we assume that Brown was "familiar with the [relevant] facts and law" in advising Cavitt to enter a guilty plea. See Herring v. Estelle, 491 F.2d at 128.

For both claimed errors—the failure to file a motion to suppress and the advice to enter a guilty plea—the prejudice analysis is the same. This is so because, in general, "once a guilty plea has been entered, all nonjurisdictional defects in the proceedings against a defendant are waived," and the waiver "includes all claims of ineffective assistance of counsel, except insofar as the

alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea." Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983) (internal citations omitted). In order "[t]o prove prejudice for an ineffective assistance of counsel claim in the context of a guilty plea, the habeas petitioner must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Bond v. Dretke, 384 F.3d 166, 167-68 (5th Cir. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)) (internal quotation marks omitted).

The record contains a declaration by Cavitt under penalty of perjury that he would have insisted on pleading guilty conditionally or would not have pleaded guilty if his counsel had informed him of the viability of a suppression motion. Indeed, after viewing the video himself, Cavitt, without delay, fired Brown and, at his own expense, hired another attorney in the hopes of successfully withdrawing his plea prior to sentencing. In light of Brown's refusal to view the video with Cavitt prior to entry of the plea, and our determination upon viewing the video that Cavitt's Fourth Amendment claim had an appreciable chance of success, we conclude that the claimed ineffectiveness was related to the voluntariness of the plea and that there is insufficient record evidence at this juncture to establish that Cavitt's claims of ineffective assistance of counsel are without merit.

## C. Evidentiary Hearing Requirement

The ultimate question before us is whether the district court's failure to hold an evidentiary hearing was an abuse of discretion. See United States v. Edwards, 442 F.3d 258, 264 (5th Cir. 2006). Rule 8 of the Rules Governing Section 2255 Proceedings provides that "[i]f the motion is not dismissed, the judge must review the answer, any transcript and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing

is warranted." Id.

As noted above, the applicable standard of review is "abuse of discretion." To establish abuse of discretion, a petitioner must present "independent indicia of the likely merit of [his] allegations." Edwards, 442 F.3d at 264. Once such independent evidence is presented, "[a] motion brought under 28 U.S.C. § 2255 can be denied without a hearing "only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992).

The videotape evidence constitutes an independent indicium of the likely merit of Cavitt's claims. As noted above, our review of the videotape led us to conclude insufficient record evidence supported the lower court's conclusion that Cavitt's claims of ineffective assistance of counsel were without merit. The record does not "conclusively show that [Cavitt] is entitled to no relief," and we conclude that the court below erred by failing to hold an evidentiary hearing[7] prior to denying his § 2255 motion. See United States v. Bartholomew, 974 F.2d at 41.

We do not, however, "predict or intimate the legal consequences of any findings or holdings on the matter[ ] remanded for further hearing. The point is that we do not know, nor does the District Court know, whether [Cavitt . . . ] was unconstitutionally deprived of . . . effective assistance of counsel . . . . . The hearing is the thing." Friedman v. United States, 588 F.2d 1010, 1017 (5th Cir. 1979).

Accordingly, the judgment of the district court denying Cavitt's § 2255

---

[7] Several statements in the magistrate judge's report and recommendation suggest that the court below did not view the videotape before denying Cavitt's motion. For example, the magistrate judge's conclusion that reasonable suspicion justified the prolonged detention included information the officers obtained after the computer check had come back negative. The magistrate judge wrote that "[w]hen the officer asked if there was a drug problem in Movant's hometown, Movant's demeanor changed. Based on his suspicions, the officer asked Movant to follow him to the next exit . . . ." However, the videotape clearly reflects that the questioning about the drug problem occurred after the move to the exit.

motion is VACATED and the motion is REMANDED to the district court for an evidentiary hearing on the ineffective assistance of counsel claims discussed above.