**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Ronald Wayne DAVIS,
Defendant-Appellee.**

No. 83–4722.

United States Court of Appeals,
Fifth Circuit.

Jan. 3, 1985.

Rehearing Denied Jan. 30, 1985.

Glen H. Davidson, U.S. Atty., John Marshall Alexander, Asst. U.S. Atty., Oxford, Miss., Mervyn Hamburg, Kathleen A. Felton, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Robert McDuff, University Law School, University, Miss., for defendant-appellee.

Before THORNBERRY, GARWOOD and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

Defendant-Appellee, Ronald Wayne Davis, was indicted on one count of receiving and possessing firearms in interstate commerce by a convicted felon in violation of 18 U.S.C. § 1202(a)(1) (Supp.). Davis filed

a motion in the district court to suppress all evidence of the firearms and the statements made by him at the time of their discovery, contending that they were obtained in a warrantless search of his house and that any consent to search was invalid as having been obtained by deceit and trickery. After an evidentiary hearing, the district court issued oral findings and granted Davis' motion. The government conceded that the suppressed evidence was essential to its case and the court granted Davis' motion to dismiss the indictment with prejudice. The government appeals from the district court's order sustaining the defendant's motion to suppress the evidence and dismissing the indictment. We reverse.

THE FACTS

On May 2, 1982, the Panola County, Mississippi, Sheriff's office received a report that Billy Woods (defendant's uncle) had a machine gun in his possession. Deputy Sheriff Willie Joiner contacted the Bureau of Alcohol, Tobacco, and Firearms ("BATF") and requested that the Bureau investigate the report. The investigation was conducted jointly by Deputy Joiner and BATF Special Agent Don Medley.

On May 3, 1982, Joiner and Medley visited Woods. Woods told the officers that he did not have a machine gun but that the day before he had "been down shooting snakes or turtles or something on the river with his nephew, Ronnie Davis." Then, in response to a request by agent Medley, Woods took the officers into his house and allowed them to look at the guns he owned. The officers found no machine gun; however, they did find ammunition for an automatic weapon. Woods had no explanation as to how the ammunition got into his house.

The next day, May 4, the officers interviewed Mrs. Woods, Billy Woods' wife. She told the officers that it was possible

that her nephew, defendant Ronald Davis, had brought some machine guns from Texas and that she had heard that there was more than one machine gun around. Mrs. Woods also indicated that Davis had a previous conviction. Later that day Medley and Joiner went to the Panola County courthouse where they discovered that Davis had a prior felony conviction for possession of marijuana. Both Medley and Joiner knew that possession of any firearms by a convicted felon was a federal crime.

On May 5, Medley and Joiner went to Davis' house. When they drove into the driveway Davis was standing on the back porch. After introductions and some idle conversation, agent Medley said to Davis: "I guess you know why we are here." The testimony was conflicting as to whether agent Medley then told Davis that the officers were there to look for a machine gun or whether Davis said that he knew they were there to look for a machine gun. The district court found it unnecessary to resolve the conflict, finding that it was clear that Davis understood that the officers were there to investigate a report of a machine gun and that the officers knew that this was Davis' understanding. Davis then stated that he did not have a machine gun but that he did have other guns. It is undisputed that Davis volunteered the information that he had other guns. The district court found that it was undisputed that Davis then said, "Well, I have no objection to your entering the house to show you what guns I do have."[1]

The officers followed Davis into the house. Davis took an unloaded revolver out of a piece of furniture next to the door. Then he took the officers to the back bedroom. Davis collected another revolver, several rifles and shotguns and placed all of the firearms on the bed. He told the officers that was all of the guns he had.

1. Agent Medley and Deputy Joiner both testified that after Davis denied ownership of a machine gun and stated that he had other guns, Davis voluntarily asked the officers into the house and offered to show them his guns. Davis testified that he invited the officers in only after agent Medley requested to be allowed to look at the guns. The defendant's two witnesses—Davis' wife and his half-brother—both testified that they heard parts of the conversation on the back porch and that they heard agent Medley ask if he could come in and see the guns.

There was no machine gun. Agent Medley then asked if he could record the serial numbers and told Davis that it was unlawful for Davis to possess firearms since he was a convicted felon. Medley went to his car, came back with a rights form and read Davis the *Miranda* warnings. Davis acknowledged that he understood his rights and signed a waiver of rights form. Davis later signed a form abandoning the weapons to the BATF. Davis was not arrested at that time.

Davis was indicted for unlawful receipt and possession of firearms in interstate commerce by a convicted felon. Davis testified at the suppression hearing that he let the officers into the house to see his guns because he believed that the officers were looking for a machine gun and he wanted to clear himself of suspicion. He also testified that he would not have let the officers into the house if they had told him they were looking for *any* guns or if they had told him that they knew he was a convicted felon and it was unlawful for him to possess any firearms.

The district court granted Davis' motion to suppress. The court found that the entry of the officers was "through a form of misrepresentation or half truths." The court found that the "defendant admitted them to the house under the firm impression that he had nothing to hide so long as he didn't have a machine gun in his possession" and that it was "the obligation of the federal officers, if they wished to enter that house, by way of a valid consent to search, that the defendant be told exactly what he was confronted with, the nature of the charge, and not get into the house through any form of deceit or misrepresentation." The district court concluded that the officers did not fulfill this obligation and that Davis' consent was vitiated by the officers' misrepresentation of the nature and scope of their search.

## THE MOTION TO SUPPRESS

■ It is well-settled that a warrantless search will be valid if it is conducted pursuant to the defendant's voluntary consent. *Schneckloth v. Bustamonte,* 412

U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Courts must analyze the totality of the circumstances to determine whether the consent was knowingly and voluntarily given. *Id.* Any misrepresentation by the government is a factor to be considered in evaluating the circumstances. *United States v. Andrews,* 746 F.2d 247, 250 (5th Cir.1984). The issue to be decided is whether, looking at all of the circumstances, the defendant's will was overborne. *Andrews, supra,* at p. 249. The district court held that under the circumstances in this case the consent to search was involuntary because it was induced by misrepresentation and deceit. The district court's determination on the issue of voluntariness is a finding of fact that cannot be overturned unless clearly erroneous. *United States v. Phillips,* 664 F.2d 971, 1023 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

■ Davis contends that the officers intentionally misrepresented the nature and scope of their investigation. It is Davis' position that at the time the officers arrived at his house the officers were in fact looking not only for a machine gun but for any firearms. Davis argues that the officers engaged in trickery or deceit by leading him to believe that they were looking for a machine gun and by failing to inform him that they were looking for any firearms. Davis argues that the officers' failure to tell him the full scope of their investigation misled him and that if there had been full disclosure he would not have consented to let the officers enter the house.

There is evidence in the record that the officers might have had reason to suspect that Davis had possession of firearms other than a machine gun. There is testimony that on May 3 Billy Woods told the officers that he (Woods) had "been down shooting snakes or turtles or something on the river with his nephew, Ronnie Davis." There is not, however, any evidence to suggest that the officers acted on this information or had any intent to act on the information. Davis did not even become a suspect in the

investigation until the next day, after the officers received information from Mrs. Woods that Davis might be connected with the reported machine gun. Davis argues that the fact that the officers went to the county courthouse to see if he had a record supports a finding that the officers were investigating Davis for something more than suspected possession of a machine gun. Davis argues that since it is illegal for anyone to possess a machine gun, there was no reason to look up his record unless the officers were in fact investigating him for possession of firearms in general. The record reflects only that the officers checked Davis' record to confirm Mrs. Woods' statement that Davis had previously been convicted. At oral argument, the government's attorney suggested that there was a legitimate reason for investigating Davis' prior record since possession of a machine gun by a convicted felon violates two federal statutes, whereas, only one federal statute is violated when a non-felon is in possession of a machine gun. There is no direct evidence that the officers had more than one purpose in going to Davis' house. Both Medley and Joiner testified that prior to their discussion with Davis at his home on May 5, they were only investigating the report of a machine gun.

The district court did not make any finding regarding the officers' intentions prior to the time they went to Davis' home. Rather, the court found that when Davis voluntarily stated that he had other guns and invited the officers in to see them the officers had a duty to tell Davis that the nature and scope of their investigation was no longer limited solely to machine guns. At that point the officers had two purposes in wishing to see Davis' guns—(1) to see if there was a machine gun, and (2) to ascertain whether Davis, a convicted felon, was illegally in possession of firearms. The

district court believed that the officers' failure to apprise Davis of both of these purposes constituted misrepresentation and trickery.

■ The mere failure of the officers to give an encyclopedic catalogue of everything they might be interested in does not alone render the consent to search involuntary. In *United States v. Andrews*, 746 F.2d 247 (5th Cir.1984), this court stated that the mere failure of a federal agent to state one of his purposes in requesting to inspect the defendant's guns did not render the defendant's consent to the inspection involuntary. *Andrews, supra,* at p. 249 note 3. In *Andrews,* the defendant, who was in the custody of a federal agent, told the agent that he had two guns at home. The agent asked the defendant if he could inspect the guns, stating that the reason for the request was that someone fitting the defendant's description had been implicated in a series of robberies. The district court found that the agent had another, unstated, reason for requesting to see the guns—to establish possession of firearms so that the defendant could be charged with illegal possession of firearms by a felon. The defendant produced the guns, believing that he was clearing himself of the robberies and testified that if he had known the agent's unexpressed motive, he would not have produced the guns. The district court in *Andrews* denied the defendant's motion to suppress. On appeal this court stated:

> In the event that [the agent] had no fraudulent intent, we would have no hesitancy in affirming the conviction; a mere failure to state a purpose does not render the defendant's consent involuntary.

*Andrews, supra,* at p. 249 n. 3.[2] After examining the totality of the circumstances, this court concluded that Andrews' consent had been voluntarily given and af-

---

**2.** In affirming the conviction in *Andrews* this court held that the consent was voluntary even assuming that the federal agent intended to trick the defendant into producing the guns by totally misstating his purpose. *Andrews, supra,* at p. 249. In our case, there is no evidence of

fraudulent intent. The district court did not find that the officers had misstated their purpose; rather, it found that they had misrepresented their purpose by telling only "half-truths" since they revealed only one of their purposes.

firmed the conviction. The court concluded by stating:

> ... what seems lacking here is any evidence that Andrews' will was overborne. While one might be quite willing to assume that Andrews understandably was anxious to clear his name of any robbery charge (real or imagined), Andrews' production of the gun seems less due to police coercion or trickery than it does to his own lack of knowledge that his possession was unlawful or his unfounded hope that [the agent] would overlook the infraction. Throughout the interrogation, Andrews showed no hesitancy in answering police questions or in otherwise cooperating with the police.

*Andrews, supra,* at p. 250 (footnotes omitted). Likewise, in this case, there is no evidence that Davis' will was overborne. Davis was not in custody when he consented to the search, he was not arrested that day, and there was no evidence of any coercion. During the officers' investigation of a machine gun, Davis voluntarily offered evidence of other crimes and the officers simply acted on Davis' admission. The record does not support a finding that prior to the time that Davis stated that he had other guns and invited the officers to see them the officers were investigating Davis for possession of firearms. The officers' second purpose in wanting to see the guns did not arise until Davis had admitted possession of them. The officers did not have a legal duty to tell Davis that it was illegal for him to possess firearms. The mere failure to warn an individual that an investigation might result in criminal charges does not constitute fraud, deceit or trickery. *United States v. Prudden,* 424 F.2d 1021, 1033 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

In *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982), this court noted some of the factors to be considered in evaluating whether a defendant's consent was voluntary: the "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, and, significantly, the defendant's belief that no incriminating evidence will be found." *Phillips,* 664 F.2d at 1023–1024.

■ It is undisputed that Davis volunteered the information he had other guns. Davis told the officers he had no objection to their entering the house and looking at the guns. There is no evidence that he was under any pressure or coercion to let them in. The consent was given in a noncustodial situation. The officers did not search the house; rather, Davis freely walked around the house and produced various firearms. Immediately after Davis displayed the firearms, agent Medley told Davis that his possession of firearms was illegal and advised him of his rights. Davis stated that he understood his rights and he voluntarily waived them. Davis was not placed under arrest. There has been no claim of any intimidation, coercion, or threats of force. The evidence shows that Davis cooperated fully with the officers in every way both before asking them into the house and after. Moreover, as in *Phillips* and *Andrews,* Davis' belief that no incriminating evidence would be found supports the validity of the consent. There was no testimony at the suppression hearing as to whether Davis knew he had a right to refuse to consent. Proof of knowledge of the right to refuse consent is not required to show voluntariness. *Schneckloth,* 412 U.S. at 249, 93 S.Ct. at 2059. In this case, the only circumstance that might even tend to suggest involuntariness is the fact that the officers did not disclose to Davis prior to entering the house that they knew he was a convicted felon and that if they found him to be in possession of firearms he could be charged with violation of a federal statute. Under these circumstances, the officers' unrevealed knowledge did not render Davis' consent involuntary.

Davis relies on the following cases for support of his claim that his consent was

involuntary: *Alexander v. United States,* 390 F.2d 101 (5th Cir.1968); *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977); *Graves v. Beto,* 424 F.2d 524 (5th Cir.), *cert. denied,* 400 U.S. 960, 91 S.Ct. 353, 27 L.Ed.2d 269 (1970). Each of these cases is distinguishable. In *Alexander* the government inspector testified that he intentionally tricked the defendant in order to obtain a waiver of his rights. The court found that the waiver was involuntarily given because the inspector intentionally made a false statement of his purpose that was calculated to mislead the defendant. *Alexander* also involved an illegal arrest. In *Tweel,* an IRS agent intentionally led the defendant to believe that the evidence was to be used only in a civil investigation when, in fact, he was conducting a criminal investigation. The court found this to be "a sneaky deliberate deception by the agent." *Tweel,* 550 F.2d at 299. In *Graves,* the defendant, who had initially refused to give a blood sample, gave his consent after being told that the sample would be used *only* to determine the alcohol content of his blood. The court refused to allow the blood sample to be used later to establish identity in a rape case.

In each of the cases relied upon by Davis, the government agent was found to have intentionally deceived the defendant by making false representations in order to induce consent.[3]

In this case, all of the statements the officers made and the impressions they gave were true—they *were* looking for a machine gun. There is no evidence that they at any time assured Davis that his production of the guns would be used *only* to ascertain whether any of them were machine guns. Moreover, there is no evidence in the record of any intent to deceive on the part of the officers.

After a careful review of the entire record, we conclude that the district court's

finding that Davis' consent was involuntary because of misrepresentation and trickery on the part of the officers is clearly erroneous. We are left with the definite and firm conviction that an error has been made. Accordingly, the district court's order suppressing the evidence and dismissing the indictment is REVERSED.

---

**3.** In *Tweel,* the intentional misrepresentation was made by silence. The agent knew that the defendant believed that the investigation was a civil one, and the agent knew that the defendant's belief was completely false. The court held that under the facts of that case the agent had a duty to correct the false impression held by the defendant. *Tweel,* 550 F.2d at 299. In our case, Davis was not under a false impression; the officers were looking for a machine gun.