# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 13, 2021

Lyle W. Cayce
Clerk

No. 18-11486

United States of America,

*Plaintiff—Appellee*,

*versus*

Gregory Bogomol,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:17-CV-216

---

Before Dennis, Elrod, and Costa, *Circuit Judges*.

Per Curiam:[*]

After unsuccessfully challenging on direct appeal his guilty plea to two counts of producing child pornography, Gregory Bogomol filed a motion to vacate his sentence under 28 U.S.C. § 2255 contending that he received ineffective assistance of counsel. Bogomol argued in the district court that his trial counsel should have moved to suppress evidence of child

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 18-11486

pornography obtained from a search of Bogomol's cell phone because his consent to that search was allegedly involuntary.  The district court denied the § 2255 motion without conducting an evidentiary hearing.  On appeal, Bogomol argues that the district court should have conducted an evidentiary hearing and granted his § 2255 motion.  We disagree and hold that the district court did not abuse its discretion.  Accordingly, we AFFIRM.

I

In 2013, the Department of Homeland Security received information that a minor male had been induced to send nude photographs of himself to a person presenting as a minor female named "Crystal Williams."  When the minor declined a request to send a full-body picture, "Crystal Williams" threatened to send the minor's nude photographs to the minor's friends if he did not comply.

Investigating agents discovered that the phone number and e-mail used by "Crystal Williams" was associated with a credit card belonging to Gregory Bogomol and a physical address associated with Bogomol's father's name.  The agents also determined that Gregory Bogomol was a public-high-school teacher living in Fort Worth, Texas.  Concluding that they lacked probable cause to conduct a search, the agents went to Gregory Bogomol's residence and knocked on the door.

When Bogomol's wife answered the door, the agents introduced themselves as Department of Homeland Security agents and "stated that [they] were investigating a matter that someone was possibly using [the Bogomols'] identity on the Internet."  Bogomol's wife invited the agents inside. Once inside the house, the agents encountered Bogomol and sat down at a table with Bogomol and his wife.  At that point, the agents "explained that [they] conduct investigations related to child exploitation" and that "[the Bogomols'] name and address [were] associated with the

investigation." The Bogomols then stated that they worked in education and would be happy to assist the agents.

Bogomol consented to a search of his phone. One of the agents, upon viewing the phone, opened an application and saw numerous pictures of young males in different stages of undress. The agent told Bogomol that they needed to talk about the pictures, but that he was not "under arrest or being detained in any way," and that "he did not have to answer any of [the] questions." Bogomol responded that he wanted to speak about it in private, at which point the agents "gave him the opportunity to take a ride with [them] in" the agents' vehicle. After telling his wife that he was going with the agents to fill out some paperwork, Bogomol went with the agents in their vehicle.

Once in the vehicle, the agents again questioned Bogomol about the pictures, and Bogomol confessed to using the online persona of a minor female to entice minor males to produce pictures of their genitals. He admitted that he spent two to three hours per day soliciting nude photographs of minor males, including students at the high school he taught at, and that he would attempt to blackmail victims with their nude photographs if they failed to comply with his demands. The Department of Homeland Security subsequently secured a search warrant for Bogomol's cell phone and found a large number of pornographic images of minors on it.

A federal grand jury indicted Bogomol on two counts of production of child pornography under 18 U.S.C. § 2251(a). Bogomol's defense counsel did not advise him of any potential suppression issues, and Bogomol pleaded guilty pursuant to a written plea agreement. He was sentenced to two consecutive sentences of 360 months' imprisonment.

On direct appeal, Bogomol argued that his conviction was flawed because had "did not admit that the images would move across state lines."

*United States v. Bogomol*, 623 F. App'x 219, 220 (5th Cir. 2015). This court affirmed his conviction, *see id.* at 221, and the Supreme Court denied his petition for certiorari, *see Bogomol v. United States*, 577 U.S. 1229 (2016).

Almost a year later, Bogomol filed the instant motion to vacate his sentence under 28 U.S.C. § 2255 in the United States District Court for the Northern District of Texas. He asserted a single claim in the motion: that his defense counsel provided ineffective assistance by failing to file a motion to suppress and failing to advise him of the potential suppression issues prior to the entry of a guilty plea. He argued that the agents induced his consent to their search by giving him and his wife the impression that the agents were investigating identity theft, not child pornography. In support of this assertion, Bogomol attached what he alleged were defense counsel's contemporaneous notes from his intake interview; the notes apparently relayed Bogomol's statement to defense counsel that the DHS agents "said [they were] here for identity theft." That alleged misrepresentation, argued Bogomol, vitiated his consent and made the search unconstitutional under the Fourth Amendment.

The district court denied the § 2255 motion without an evidentiary hearing. It concluded that "no misrepresentation occurred that would have overcome Bogomol's will." As to the intake notes, the district court concluded that (1) the agents' statements about their investigation were not an "affirmative misrepresentation" or "a deliberate attempt to deceive" because "the record shows that agents were present regarding an ongoing child-exploitation investigation that was associated with Bogomol's identity" and (2) that the statement in the notes was unreliable because it was not supported by affidavits or meaningful context. Finally, the district court determined that Bogomol could not show that he had been prejudiced by any potential failing by defense counsel because his plea agreement stated that he had "thoroughly reviewed all legal and factual aspects of this case with his

lawyer" and was "fully satisfied with that lawyer's legal representation." The district court declined to grant a certificate of appealability.

Bogomol then moved for a certificate of appealability in this court. The motion was granted on the following issue:

> Whether the district court abused its discretion in denying, without conducting an evidentiary hearing, his ineffective assistance claim based on counsel's failure to investigate or advance the claim that Bogomol's consent to search his electronic devices was involuntary because it was based on false or pretextual representations or to advise Bogomol as to the possible merit of the suppression issue.

## II

On an appeal from a denial of a § 2255 motion, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Cavitt*, 550 F.3d 430, 435 (5th Cir. 2008). We review a district court's refusal to grant an evidentiary hearing on a § 2255 motion for abuse of discretion. *Id.*

To warrant an evidentiary hearing, the petitioner must "produce[] independent indicia of the likely merit of [his] allegations." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998)). "Once such independent evidence is presented, '[a] motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief.'" *Cavitt*, 550 F.3d at 442 (quoting *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992)). When "the files and records of a case make manifest the lack of merit of a Section 2255 claim, the trial court is not required to hold an evidentiary

hearing." *United States v. Hughes*, 635 F.2d 449, 450 (5th Cir. Unit B Jan. 1981).[1]

### III

Bogomol asserts that his counsel's assistance violated his Sixth Amendment right to effective assistance of counsel because his counsel did not investigate or object to the evidence obtained from the search of his phone. To prevail, Bogomol must prove both (1) that his counsel's performance "fell below an objective standard of reasonableness" "under prevailing professional norms" and (2) that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88. Under the deficiency prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In the context of a guilty plea, counsel's performance is deficient when counsel's advice leaves the defendant unable "to make an informed and conscious choice to plead guilty." *Cavitt*, 550 F.3d at 441. Under the prejudice prong, the petitioner must show "a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) (quoting *United States v. Smith*, 844 F.2d 203, 209 (5th Cir. 1988)).

Because Bogomol's ineffective-assistance claim rests on the viability of his forgone Fourth Amendment claim (that the search of his phone was unconstitutional), our "inquiry . . . entails an assessment of [that] putative Fourth Amendment claim." *Cavitt*, 550 F.3d at 435.[2] Bogomol's primary

---

[1] *See also Hughes*, 635 F.2d at 451 ("A motion to vacate judgment and sentence filed pursuant to 28 U.S.C. § 2255 does not automatically mandate a hearing.").

[2] *See also Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment

argument is that his consent to the agents' search of his phone was involuntary. Whether Bogomol's consent was voluntary is a question of fact, reviewed for clear error. *United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997). Voluntariness is evaluated "from the totality of the circumstances surrounding the search." *Id.* at 121.[3]

In examining the totality of the circumstances of the search, we weigh six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Id.* (quoting *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988)).

Although "no single factor is dispositive or controlling of the voluntariness issue," we have held that "'[c]onsent' induced by an officer's misrepresentation is ineffective." *Id.* (quoting *Olivier-Becerril*, 861 F.2d at 426); *Cavitt*, 550 F.3d at 439.[4] "The issue to be decided is whether, looking

---

claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.").

[3] The dissenting opinion contends that we have inverted the standard of review. Not so. This case presents two layers of deference to the district court's determination, with the first being our review of its denial of an evidentiary hearing. That standard is abuse of discretion. *Cavitt*, 550 F.3d at 435. The second layer is our review of the district court's determination that Bogomol's consent was voluntary. That standard is clear error. *Tompkins*, 130 F.3d at 120. We follow this two-layer approach, as required by our precedent.

[4] *See also United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977) ("It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the [government].").

at all of the circumstances, the defendant's will was overborne." *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985).

Other than a one-sentence assertion that he was never told that he could refuse to give consent to the search, Bogomol focuses entirely on the second *Tompkins* factor and argues that the agents used coercion by "tricking" him into giving his consent.[5] He contends that his wife was tricked by the agents telling her at the front door that someone was "possibly using [the Bogomols'] identity on the internet" and by the agents allegedly asking him a question about whether his credit card had been stolen.[6]

Bogomol also directs us to our decision in *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). There, the defendant wanted to determine whether an IRS investigation was a criminal one, so he asked the IRS whether a "special agent"—the type of agent that normally conducts criminal investigations—was involved in the investigation. *Id.* at 298. The IRS truthfully responded that no special agent was involved, but did not mention that the investigation had been initiated by the Organized Crime and Racketeering Section of the DOJ. *Id.* The defendant, believing from the IRS's answer that the investigation was not criminal, voluntarily provided the

---

[5] Bogomol does not specifically argue that the agents intended to deceive him. Instead, he argues that he and his wife were in fact deceived by the agents' alleged "misrepresentations."

[6] The dissenting opinion is incorrect that this case presents conflicting evidence. To the contrary, the parties agree about what was said and when it was said. Moreover, the fact that Bogomol's wife may have been under the impression that the agents were only investigating identity theft does not create a fact dispute on whether she was tricked or not. Voluntariness of consent is an objective inquiry that asks "what would the typical reasonable person have understood by the exchange." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Thus, the subjective impression of Bogomol's wife or how she felt is not relevant. As we have explained above, there was indeed evidence of possible identity theft and the agents told Bogomol's wife that at the front door. The agents never stated that identity theft was the only reason for their visit.

No. 18-11486

IRS with documents that led to criminal charges against him. *Id.* This court held that this counted as the sort of "sneaky deliberate deception" that vitiated voluntariness. *Id.* at 299. Bogomol argues that the government also used sneaky deliberate deception against him and that he therefore did not provide voluntary consent to the search.

In response, the government argues that the agents did not use coercion to gain Bogomol's consent. The government's principal argument is that, far from being deceptive, what the agents told the Bogomols was in fact *true*. The government contends that what was told to Bogomol's wife at the front door was *true*—that they thought that someone was "possibly using [the Bogomols'] identity on the internet." (As explained above, the name on the account that solicited the child's photo was Crystal Williams, Bogomol's phone number was associated with the credit card on the account, and Bogomol's father's name was also associated with the credit card.) In addition, once inside the house with both Bogomols, the agents explicitly told the Bogomols that they investigated "child exploitations," which was also true.

Citing our decision in *Davis*, the government also contends that Bogomol's consent was voluntary because the agents did not "intentionally deceive[]" Bogomol. 749 F.2d at 297. In *Davis*, law enforcement officers gained entry to the defendant's home and consent to search it based on the officers' statement that they were looking for an illegal machine gun. *Id.* at 293. The officers did not find a machine gun, but they did find other guns in the house and charged the defendant with being a felon in possession of a firearm. *Id.* at 294. We held that the defendant's consent was voluntary because "[t]he mere failure of the officers to give an encyclopedic catalogue of everything they might be interested in does not alone render the consent to search involuntary." *Id.* at 295. Here, the government notes that the agents never "assured" Bogomol that the conversation and subsequent

search "would be used *only*" to dispel identity theft. *Id*. at 297. And the government argues that "there is no evidence in the record of any intent to deceive." *Id.* The government argues that the agents were required only not to affirmatively misrepresent. *Cavitt*, 550 F.3d at 439.

As for Bogomol's argument that he did not know that he could refuse consent to the search of his phone, the government argues that he must have known that because he "disappeared" from the room during the agents' discussion with him and his wife and came back only after being called for by the agents. But our precedent teaches that, on this *Tompkins* factor, we look to what the law enforcement officers told the defendant: "An officer's failure to inform a suspect that he has a right to refuse to consent to a search militates against voluntariness." *United States v. Soriano*, 976 F.3d 450, 457 (2020). Because the agents did not tell Bogomol that he could refuse consent, the fourth *Tompkins* factor weighs in Bogomol's favor.

Bogomol makes no argument as to the four other *Tompkins* factors, and the government contends that all of those weigh against him. On the custody factor, the government notes that Bogomol was in his own home and not in custody. On the cooperation factor, the government notes that Bogomol and his wife indicated that they were "happy to assist" the agents, that Bogomol handed over his computer and phone, and that Bogomol told the agents that he would talk with them about the photos found on his phone—as long as he could do so away from his wife. On the intelligence factor, the government notes that Bogomol has two bachelor's degrees and was employed as a teacher. Finally, the government argues that the sixth factor also weighs in its favor, as it is likely that Bogomol (wrongly, as it turned out) believed that no incriminating evidence would be found on his phone, as he had deleted the application that he had used to communicate with the minor.

On this record, we cannot say that the district court clearly erred in determining that Bogomol's consent was voluntary.  The first step in figuring out if Bogomol was actually "Crystal Williams" was to determine whether someone was "possibly using [the Bogomols'] identity on the internet"— which is precisely what the agents told Bogomol's wife that they were there to investigate.[7]  That was not a misrepresentation.  And neither was the statement told to both of the Bogomols once the agents were inside the house: that they investigated "child exploitations" and that "[the Bogomols'] name and address [were] associated with the investigation."  The government did not "materially deceive[]" Bogomol, and Bogomol does not argue that the government intended to deceive him.  *Tweel*, 550 F.2d at 300.  On the facts of this case, we cannot say that Bogomol's "will was overborne" such that his consent was involuntary.  *Davis*, 749 F.2d at 294.

As for Bogomol's comparison of his case to *Tweel*, that comparison is inapposite.  In *Tweel*, the government agent knew that the defendant believed that the investigation was a civil one, and the agent knew that the defendant's belief was completely false.  *Tweel*, 550 F.2d at 299.  Under the facts of that case—where government agents had "mask[ed]" the nature of the investigation and "materially deceived" the defendant—we held that the government agent had a duty to correct the false impression held by the defendant.  *Id*. at 300.  In this case, there have been no material deceptions.

Bogomol alternatively argues that the agents violated his Fourth Amendment rights long before searching his phone, by knocking on his door and entering his house as part of their attempt to criminally investigate him.  But officers can generally employ "a 'knock and talk' strategy where [they] seek to gain an occupant's consent to search."  *United States v. Gomez-*

---

[7] As noted above, both Bogomol's name and his father's name were associated with the cell phone and e-mail address that solicited photos from the minor.

*Moreno*, 479 F.3d 350, 355 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452 (2011); *see also Westfall v. Luna*, 903 F.3d 534, 545 (5th Cir. 2018) ("We have recognized the knock-and-talk strategy as 'a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.'" (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001))). Officers exceed their customary license to approach a home and knock only in unusual circumstances, such as when they knock outside normal waking hours or look through the windows of the home. *Westfall*, 903 F.3d at 545.

Bogomol's trial counsel's performance did not "f[a]ll below an objective standard of reasonableness" by failing to investigate or move to suppress the evidence, so the district court rightly rejected his ineffective-assistance-of-counsel claim. *Strickland*, 466 U.S. at 688. And, because the district court had all the evidence it needed to conclusively determine that Bogomol's ineffective-assistance-of-counsel claim lacked merit, it did not abuse its discretion in not holding an evidentiary hearing. *See Cavitt*, 550 F.3d at 442.

\* \* \*

The judgment of the district court is AFFIRMED.

No. 18-11486

James L. Dennis, *Circuit Judge*, dissenting:

Gregory Bogomol challenges his federal conviction through a § 2255 *habeas* motion, arguing that his trial counsel was ineffective for failing to move to suppress a range of evidence that law enforcement obtained through searches that violated the Fourth Amendment.  The majority affirms the district court's denial of Bogomol's motion without an evidentiary hearing because it is not apparent from the current record that the district court "clearly erred in determining that Bogomol's consent [to the search] was voluntary."  Majority at 11.  It then states in a conclusory manner that the district court had all the evidence it needed to make that determination.  Majority at 11–12.  But the majority seems to conflate the district court's ultimate merits determination with the antecedent question of whether Bogomol is entitled to an evidentiary hearing, and in doing so it inverts the proper standard for determining whether an evidentiary hearing should be held.

To be sure, the voluntariness of a defendant's consent to a search is a finding of fact that is subject to clear error review when a district court decides the issue on the merits.  *See United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997).  But it is nonsensical to require Bogomol to have developed a record that clearly demonstrates his consent was involuntary in order to prove that he has a right to the very hearing that would allow him to build such a record.  At this early stage, the rule is not that a district court may deny an evidentiary hearing unless it is clear that a movant's claim is meritorious, which is the standard effectively applied on clear error review.  Rather, once, a modest threshold showing is made, a district court must *grant* an evidentiary hearing unless it is clear the movant's claim *lacks* merit.  *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008) (quoting *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992)).  Because I believe Bogomol identified sufficient evidence to raise genuine disputes regarding

facts material to his right to relief, I would hold that the district court was required to hold an evidentiary hearing on his § 2255 motion. Accordingly, I respectfully dissent.

## I.

### A.

In 2013, the Department of Homeland Security (DHS) received a tip that an individual purporting to be a minor female named Crystal Williams was communicating via smartphone messaging applications with minor males and inducing them to take and send nude photographs of themselves. DHS agents determined that the phone number the individual had used was a "virtual phone number" provided by the "Pinger" messaging application that had been registered with an America Online email address and a Google Android smartphone. Upon subpoenaing America Online's and Google's records, they found that the email address was registered in Bogomol's father's name using Bogomol's credit card and that the physical smartphone used was associated with another email address containing Bogomol's first initial and last name. Two DHS agents then went to Bogomol's residence to conduct a "knock-and-talk."

How the agents justified their presence to Bogomol and his wife is disputed, and the record contains conflicting evidence on the subject, including incidental statements made by one of the DHS agents and Bogomol's wife during their testimony for unrelated purposes at Bogomol's initial detention hearing; a paragraph in the presentence report; Bogomol's counsel's notes, which he attached to his § 2255 *habeas* motion; and the same DHS agent's self-prepared investigation report, which the Government attached to its response. At the pretrial hearing, the DHS agent testified that, when Bogomol's wife answered the door, the agents told her they "were investigating a matter that someone was possibly using [the Bogomols']

identity on the Internet." Bogomol's wife thereafter "welcomed [them] inside of the home," the agent testified, and once they were inside, the agents told her and Bogomol that they "conduct[ed] investigations related to child exploitation." This account arguably differs from the events described in the same DHS agent's investigation report and Bogomol's presentence report, which both state that the DHS agents informed the Bogomols that *their names and address* were associated with a *specific* child exploitation investigation. And it plainly differs with the account offered by Bogomol's wife, who testified at the pretrial hearing that she remained under the impression the agents were investigating identity theft—and not child exploitation—throughout the entire encounter. In a response to a question about whether she ever asked Bogomol why DHS agents had come to the house, she stated, "No . . . when they came to the door, I was under the impression that we were victims of identity theft" and "that was the premise of why I thought the investigators were there." She further stated that Bogomol never told her, "oh, it's not identity theft" and that she did not learn the nature of the allegations against Bogomol until they met with defense counsel much later. This version of events is corroborated by Bogomol's counsel's notes, which state that, when relating the story to his attorney, Bogomol said the agents had come "under [the] guise" of investigating "identity theft" and had asked him questions about whether his credit card had been stolen.

Eventually, Bogomol and his wife agreed to aid in the investigation—whatever its ostensible purpose—by allowing the agents to search their phones and home computers. On Bogomol's phone, one of the agents opened Grindr, an online dating application marketed to adult homosexual men, and discovered photos of young-looking males in various states of undress. The agent confronted Bogomol about the pictures, and Bogomol agreed to go for a ride in the agent's police vehicle to discuss the matter in private. During this ride, Bogomol confessed that it was he who had been

posing as Crystal Williams.  When DHS agents later obtained a search warrant and conducted forensic examination of Bogomol's cell phone, they found child pornography.  Bogomol pled guilty pursuant to a plea agreement to two counts of producing child pornography, and he was sentenced to two consecutive 360-month sentences.

## B.

In his § 2255 *habeas* motion, Bogomol argues that his counsel should have filed a motion to suppress his confession and the evidence gained from his cellphone because the agents used trickery to obtain consent to enter his home and search his cellphone, rendering the consent involuntary.  Bogomol contends that the agents falsely claimed that they were investigating an identity theft of which the Bogomols were the victims and that he and his wife consented to the agents' entry into their house and search of their electronics only to aid the agents in that identity theft investigation.  Because the agents searched his house and phone without valid consent, Bogomol continues, they violated his Fourth Amendment rights, and all evidence that they gained as a result of those violations would have likely been suppressed if his counsel had filed a suppression motion.

The district court denied Bogomol's § 2255 motion without an evidentiary hearing.  It concluded that it was clear from the record that no misrepresentation occurred, reasoning that the DHS agents were truthful when they stated that they were investigating whether someone was using the Bogomols' identities on the internet.  Because precedent did not require the agents to disclose an "encyclopedic catalogue of everything" they might be interested in, the court reasoned that Bogomol had failed to establish that they made an affirmative misrepresentation that would render his consent invalid.  And because it was clear that no Fourth Amendment violation occurred, the district concluded, any motion to suppress would have been

No. 18-11486

unsuccessful, and thus Bogomol's counsel was not ineffective for failing to file one.

## II.

The majority correctly states that the case centers on the question of whether Bogomol's and his wife's consent was given voluntarily; Bogomol's trial counsel cannot be ineffective for failing to argue that the Fourth Amendment was violated if it was not, *see Cavitt*, 550 F.3d at 435, and the Fourth Amendment was not violated if Bogomol and his wife voluntarily consented to the entry and search that occurred here, *see Tompkins*, 130 F.3d at 121 (citing *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)).[1] The majority errs, however, by blending its review of the evidentiary hearing question with its evaluation of the district court's ultimate findings on the merits.

---

[1] Under the familiar *Strickland v. Washington* standard, a defendant may establish that trial counsel was constitutionally ineffective by showing that (1) counsel's performance was objectively unreasonable and (2) the defendant was prejudiced by the deficient representation. 466 U.S. 668, 687–88 (1984). When a defendant pled guilty, as in this case, this means demonstrating "a reasonable probability that, but for counsel's errors, [he] would not have ple[d] guilty and would have insisted on going to trial." *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) (quoting *United States v. Smith*, 844 F.2d 203, 209 (5th Cir. 1988)). The parties and the majority appear to all agree that, if Bogomol's counsel failed to move to suppress incriminating evidence that was uncovered as a result of a Fourth Amendment violation, it was an objectively unreasonable error on the part of defense counsel. Similarly, given the extent of the incriminating evidence that resulted from the DHS agents' entry into the Bogomols' home and subsequent search of their electronics, everyone seems to agree that Bogomol was prejudiced by counsel's failure to challenge those actions if they violated the Fourth Amendment—that is, that it is reasonably probable that Bogomol would not have pled guilty had counsel brought a successful suppression motion. The ultimate *Strickland* ineffective assistance inquiry in this case therefore seems to be essentially coextensive with the underlying question of whether the DHS agents violated Bogomol's Fourth Amendment rights. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

17

Our jurisprudence regarding when a § 2255 evidentiary hearing must be held is eclectic, to say the least.  We have generally stated that we review a district court's decision on whether to hold an evidentiary hearing for abuse of discretion.  *See, e.g.*, *Cavitt*, 550 F.3d at 435; *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).  But we have also suggested that a district court has little discretion in the matter, stating that "[a] motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *Bartholomew*, 974 F.2d at 41 (citing *U.S. v. Auten*, 632 F.2d 478 (5th Cir. 1980))  Indeed, § 2255(b) itself provides that, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon."  We have nonetheless interpreted this provision to require some threshold evidentiary showing on the part of the defendant, opining that "[c]onclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing," and stating that "[a] defendant is entitled to an evidentiary hearing on his § 2255 motion only if he presents 'independent indicia of the likely merit of [his] allegations.'" *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013) (citing *Auten*, 632 F.2d at 480 and quoting *Cavitt*, 550 F.3d at 442).  But we have said "this requirement must be understood practically, in the context of the claim being presented," and we have, for example, considered what sort of evidence would actually be available to the prisoner if his or her claim were meritorious. *Id.* at 373-74 ("Moreover, it is hard to imagine what additional evidence Reed could present to establish what his trial counsel told him in a presumably private conversation.").

In the related context of a § 2254 *habeas* petition, we have long held that a district court must hold an evidentiary hearing if, along with other requirements not relevant here, the petitioner demonstrates "there is a

factual dispute which if resolved in the petitioner's favor, would entitle the petitioner to relief." *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000) (cleaned up). The inquiry, then, would seem to be somewhat akin to the summary judgment standard—when a prisoner introduces or points to evidence that creates a genuine dispute of fact that is material to the validity of his or her conviction or sentence, "the motion and the files and records" do not "conclusively show that the prisoner is entitled to no relief," and the district court is thus required to hold an evidentiary hearing to resolve the factual dispute. *See Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir. 1977) (citing *Aulds v. Foster*, 484 F.2d 945, 946 (5th Cir. 1973), a summary judgment case, for the proposition that contested fact issues in a § 2255 proceeding ordinarily cannot be decided based on affidavits alone); *Pike v. United States*, 409 F.2d 499, 501 (5th Cir. 1969) ("Where the allegations in a § 2255 motion would entitle the petitioner to relief and the files and records of the trial court are inconclusive, findings of controverted issues of material fact must be made on the basis of an evidentiary hearing, not on the basis of pleadings and affidavits.").

Because the record does not compel a contrary finding, the majority states that the district court did not clearly err in determining that the Bogomols' consent was voluntary. Majority at 11. It then summarily states that the district court had all the evidence it needed to make that finding without any further analysis, suggesting that the latter inquiry is coextensive with the former. Majority at 12. But to prevail on clear error review, Bogomol would have to show that the record clearly demonstrates his and his wife's consent were *not* voluntary, which effectively inverts the standard for an evidentiary hearing. *See Bartholomew*, 974 F.2d at 41 (citing *Auten*, 632 F.2d at 478). All Bogomol was required to do to obtain an evidentiary hearing was to show that the record did not clearly and conclusively demonstrate that the consent *was* voluntary—that is, that it contained genuinely conflicting

evidence on factual issues material to his right to relief. *See Owens*, 551 F.2d at 1054; *Pike*, 409 F.2d at 501. I believe he has done so.

The parties agree that "[i]t is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the [Government]."[2] *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). By the district court and the majority's thinking, no such "deceit, trickery, or misrepresentation," *id.*, occurred here because, even if law enforcement did tell the Bogomols that they were investigating whether someone had stolen their identities, it was technically true because "[t]he first step in figuring out if Bogomol was actually 'Crystal Williams' was to" dispel this possibility. Majority at 11. But our precedent indicates that "technically correct" is not the benchmark for these kinds of claims. Rather, the voluntariness inquiry turns on whether the officer intended to deceive the consenting party and whether the party was in fact deceived, regardless of whether the statement at issue was strictly accurate.

In *United States v. Tweel*, for instance, the defendant was convicted of various tax-related crimes after he voluntarily handed over his accounting books for inspection by the Internal Revenue Service ("IRS"). 550 F.2d 297,

---

[2] Our precedents are unclear as to whether this type of misrepresentation renders consent *per se* involuntary or the deception is simply an example of a "coercive police practice," which is one of the enumerated factors to consider when evaluating the voluntariness of consent under the totality of the circumstances analysis prescribed by *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). *See Tompkins*, 130 F.3d at 120. As the majority notes, however, we have at times stated flat out that "'[c]onsent' induced by an officer's misrepresentation is ineffective," *Cavitt*, 550 F.3d at 439, and I have found no case in which this or any other court has found that consent to a search that was obtained by law enforcement's intentional deception was voluntary. In any event, I would hold that the deception issue predominates over all other factors in judging the voluntariness of the Bogomols' consent in this case.

298 (5th Cir. 1977). When the defendant was initially contacted by the IRS regarding an audit of his books, the defendant asked whether a "special agent" was assigned to the case, which would indicate that the investigation was criminal and not the standard civil audit that any taxpayer might face. *Id.* The IRS agent truthfully responded that no special agent was assigned to the case, but he did not disclose that the audit was indeed criminal in nature, having been undertaken at the request of the Department of Justice's Organized Crime and Racketeering Section. *Id.* On appeal, this court concluded that the IRS agent knew that the defendant was inquiring about whether the investigation was criminal and intentionally deceived the defendant to make him believe that it was not. *Id.* at 299-300. Because the defendant's consent to search his books had been procured by "sneaky deliberate deception," we held that it was invalid, and thus the warrantless search of his books violated the Fourth Amendment. *Id.*

*Tweel* teaches us that, while a statement may be "on the face of it true," it can nonetheless render consent invalid if it is intentionally deceptive and "misled [the consenting party] to such a degree that his [or her] consent to the 'search' must be vitiated by the agent's silence concerning the [purpose] of th[e] investigation." *Id.* at 299. Thus, if the agents in this case intended to give Bogomol's wife the impression that they were investigating financial fraud of which the Bogomols were the victims in order to gain her consent to enter the home,[3] and she was in fact fooled by their deception, her consent to the entry was invalid regardless of the technical truth of the

---

[3] That it was Bogomol's wife's consent rather than Bogomol's own that would be rendered involuntary is not material to this case. When an individual has a Fourth Amendment privacy interest in a dwelling, that interest is violated when law enforcement enters it pursuant to a third-party's consent if that consent proves to be invalid. *See Illinois v. Rodriguez*, 497 U.S. 177, 181-82 (1990). Bogomol's Fourth Amendment rights would therefore be violated if the agents entered his home based on his wife's coerced consent.

agents' statement. Given Bogomol's wife's uncontroverted testimony that, even after the encounter was complete, she was under the "impression that [the Bogomols] were victims of identity theft" and "that was the premise of why [she] thought the investigators were there," it seems clear that she was indeed deceived by the agents' statements. This case therefore turns on the factual question of whether the agents intended to trick Bogomol's wife in order to gain entry.

When the agents arrived at the house, they knew that the phone number used by "Crystal Williams" was provided specifically for use with the Pinger messaging application and had been set up using an email address created by an internet account registered using Bogomol's credit card and Bogomol's father's name. They also knew that the physical smartphone that had been used to message the minors was registered using an email address containing Bogomol's first initial and last name. Although dispelling the unlikely possibility that someone had stolen Bogomol's smartphone *and* his credit card information *and* had used the two together may arguably have been a very minor consideration for the agents, the evidence indicates the agents did not come to the Bogomols' home as part of an investigation into whether someone was using Bogomol's identity on the internet. Rather, the agents came to investigate whether Bogomol was using "Crystal Williams's" identity on the internet.[4]

---

[4] Presumably to bolster the claim that the DHS agents told the truth when they said they were investigating whether someone was using the Bogomols' identities online, the majority emphasizes that Bogomol's father's name was also associated with the internet accounts. Majority at 11. But this does not change the fact that, prior to the DHS agents' arrival, all signs pointed to "Crystal Williams's" being Bogomol or someone closely associated with him, and there is no indication the agents truly suspected that another person was framing the Bogomols.

No. 18-11486

A reasonable inference from this evidence is that the agents' focus on the remote possibility that someone else was framing Bogomol was intended to deceive Bogomol's wife. The district court is of course not ultimately required to make this inference, but "[w]here the allegations in a § 2255 motion would entitle the petitioner to relief and the files and records of the trial court are inconclusive, findings of controverted issues of material fact must be made on the basis of an evidentiary hearing, not on the basis of pleadings and affidavits." *Pike*, 409 F.2d at 501; *see also Jones v. Polk*, 401 F.3d 257, 273 (4th Cir. 2005) (Michael, J., concurring) ("In fact, courts have consistently held that when the facts available reasonably support competing inferences, a factual dispute exists and an evidentiary hearing is required to resolve it. This approach makes sense because the very purpose of an evidentiary hearing is to resolve factual disputes that arise when affidavits or other proffered evidence reasonably support competing conclusions." (citations omitted)). Because the evidence does not "conclusively show" that the agents lacked any intent to deceive Bogomol's wife, the district court was required to hold an evidentiary hearing on the subject. *Cavitt*, 550 F.3d at 442.

The majority contends that this case is instead more like *United States v. Davis*, in which law enforcement officers came to the house of the defendant—whom they knew to be a convicted felon—following up on reports that the defendant or his uncle had an illegal machine gun. 749 F.2d 292, 293 (5th Cir. 1985). The defendant admitted that he had other guns but denied that he possessed the machine gun and consented to law enforcement's search of his house to prove it. *Id.* at 293-94. Although the police did not find the machine gun, they charged the defendant with being a felon in possession of firearms based on the other guns they found. *Id.* at 294. On appeal, this court held that the defendant's consent had not been procured by deliberate deception because the officers had truthfully told the

23

defendant that they were searching for a machine gun and "[t]he mere failure of the officers to give an encyclopedic catalogue of everything they might be interested in does not alone render the consent to search involuntary." *Id.* at 295. Because there was no evidence that the officers intentionally deceived the defendant, the court held that the consent was valid. *Id.*

But this case differs from *Davis* in key respects. In *Davis*, the officers' primary investigation did in fact center on a machine gun, and they did seek entry to the house primarily to locate the machine gun as they told the defendant. That they located other guns during the search was incidental, and the court therefore found that there was not intent to deceive the defendant. *Id.* Here, by contrast, the DHS agents' investigation did not center on the theft of the Bogomols' identities, and their true purpose in entering the house was not to gain evidence of that crime. If they intentionally led Bogomol's wife to believe the opposite, there was an intent to deceive here that was lacking in *Davis*.

The majority also points to the testimony of one of the agents at the detention hearing that, after entering the Bogomols' home, the agents told the Bogomols that their jobs included investigating child exploitation, as well as to statements in the investigation and presentence reports indicating the agents told the Bogomols that their names and address were associated with a particular child exploitation investigation. Majority at 11. But this does not cure the potential constitutional violation for at least two reasons. First, the conflicting evidence raises a genuine dispute as to whether these statements actually occurred. The DHS agent's testimony was potentially inconsistent with the statements in the investigation and presentence report; when testifying, the agent claimed to have simply told the Bogomols that investigating child exploitation was among the agents' duties and never mentioned informing the Bogomols that their names and address were associated with a specific child exploitation investigation. And the assertion

that the agents informed the Bogomols they were under investigation for child exploitation is more clearly contradicted by Bogomol's counsel's notes, which state that the agents acted "under the guise" of investigating identity theft, and Bogomol's wife's testimony that she believed the agents were investigating identity theft throughout the encounter and did not learn of their true purpose until much later. As stated above, the proper method of resolving this sort of controverted issue of material fact is through an evidentiary hearing and not on the basis of a cold, undeveloped record. *See Pike*, 409 F.2d at 501; *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 860 (10th Cir. 2005) ("The purpose of an evidentiary hearing is to resolve conflicting evidence.").

Second, and more importantly, even assuming the agents did make these statements, they did not occur until *after* they had potentially violated the Fourth Amendment by using deception to gain entry into the Bogomols' home. "The Fourth Amendment generally prohibits the warrantless entry of a person's home . . . ." *Rodriguez*, 497 U.S. at 181. And, "[i]t is axiomatic that what is reasonable depends on the circumstances, and the circumstances of a search and seizure carried out in a home necessarily include the officer's entry into the home." *Trent v. Wade*, 776 F.3d 368, 378 (5th Cir. 2015). If the DHS agents' entry into the Bogomols' home was based on invalid consent, it would constitute a Fourth Amendment violation, and the subsequent search of Bogomol's phone would be *per se* unreasonable because it resulted from "exploitation" of that entry. *New York v. Harris*, 495 U.S. 14, 19 (1990).

The majority dismisses this latter concern by noting that officers may generally perform a "knock and talk" to obtain consent to a search because police have the same customary implied license to approach a home and knock on the door that any member of the public would enjoy. Majority at 11-12 (citing *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007)

and *Westfall v. Luna*, 903 F.3d 534, 545 (5th Cir. 2018)).  But an implied license to approach a house and knock on the door does not extend to entering the building.  *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."); *Kentucky v. King*, 563 U.S. 452, 470 (2011) ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises[.]").  If the DHS agents deceived Bogomols' wife during the "knock and talk" in order to get her consent to enter the house, it is a Fourth Amendment violation irrespective of whether they were allowed to approach the house and initiate the conversation, and any subsequent searches that resulted from the unlawful entry would necessarily also violate the Fourth Amendment. *Harris*, 495 U.S. at 19.

Finally, as noted above, our court has held that the showing required for an evidentiary hearing "must be understood practically, in the context of the claim being presented," including by considering the kind of evidence reasonably available to the prisoner. *Reed*, 719 F.3d at 373-74.  Short of the DHS agents recanting, "it is hard to imagine what additional evidence [Bogomol] could present to establish what [the agents] told him [and his wife] in a presumably private conversation." *Id.* at 374.  Perhaps an affidavit from Bogomol's wife would be useful.  But given the nature of Bogomol's crime, it is possible—even likely—that their relationship has soured and that she would not cooperate in an effort to set aside his conviction without the compulsion of legal process that would be available through an evidentiary hearing.  Given the practical realities of Bogomol's situation, he has potentially submitted the best evidence available to him, and it is sufficient to raise genuine factual questions about whether his counsel was constitutionally ineffective.

No. 18-11486

\* \* \*

In sum, the evidence in this case raises sufficient factual disputes to warrant holding an evidentiary hearing to determine what actually occurred on the day at issue. Though Bogomol may be a particularly unsympathetic prisoner, a bedrock principle of our system is that it protects against unreasonable searches and guarantees the effective assistance of criminal counsel for everyone; it likewise affords all the right to challenge the legality of their imprisonment when it results from the deprivation of both of these fundamental constitutional rights. It bears reiterating that, aside from the few exhibits attached to Bogomol's motion and the Government's response, no court has ever taken evidence specifically on the question of what law enforcement said and did when they arrived at the Bogomols' home. The district court made its findings based only on incidental mentions of the events during testimony on other topics at Bogomol's pretrial detention hearing and in the presentence report, Bogomol's counsel's notes, and one of the DHS agent's self-authored investigation report, all of which contain only vague and contradictory information regarding the key issue of how the agents gained access to the Bogomols' house and phones. The majority states that this was "all the evidence [the district court] needed to conclusively determine" that the DHS agents did not deceive Bogomol or his wife. Majority at 12. But I do not believe § 2255(b), our precedent, or fundamental notions of fairness permitted the court to deny Bogomol's motion on a record this sparse and inconclusive.

I would hold that the conflicting evidence in this case demonstrates that a genuine factual dispute exists regarding whether law enforcement intentionally deceived Bogomol and his wife, tricking them into believing the agents were investigating a financial crime of which the Bogomols were the victims in order to obtain their consent to enter their home and search their phones. If this did occur, their consent was coerced and involuntary, and the

searches violated the Fourth Amendment.  And it would follow that Bogomol's counsel was constitutionally ineffective for failing to raise the issue.  Because Bogomol points to evidence of "a factual dispute[,] which[,] if resolved in [his] favor, would entitle [him] to relief," *Murphy*, 205 F.3d at 815 (internal quotation marks omitted), the filings in this case do not "conclusively show that [Bogomol] is entitled to no relief," *Bartholomew*, 974 F.2d at 41, and the district court was obligated to hold an evidentiary hearing. I therefore respectfully dissent.